IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| Duratech Industries | ) | |
| International, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:05-cv-90 |
| vs. | ) | |
| | ) | |
| Bridgeview Manufacturing, | ) | |
| Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

### I. Introduction

This case is a declaratory judgment action brought by the plaintiff, Duratech Industries, for noninfringement and patent invalidity concerning two United States patents owned by the defendant, Bridgeview Manufacturing. The defendant has filed a Motion to Dismiss under Rule 12(b)(1), asserting lack of subject matter jurisdiction (doc. #11). As explained below, the Motion is **DENIED.**

### II.  Background

This case arises out of two patents relating to crop material processors, United States Patent Nos. 6,109,553 and 6,375,104. Duratech is a corporation existing under the laws of North Dakota and has its principal place of business in Jamestown, North Dakota. Duratech is the manufacturer of the

1

"BaleBuster," model no. 2650, which is the subject of this lawsuit.  Bridgeview is a corporation existing under the laws of Saskatchewan, Canada and has its principal place of business in Saskatchewan. Bridgeview is the owner of the two American patents in question.

On July 25, 2003, Bridgeview's Canadian Counsel, Christopher C. Van Barr of the Ottawa firm Gowling, Lafleur, Henderson, LLP, sent a letter to plaintiff, which stated, "We are counsel for Bridgeview Manufacturing Inc. We enclose for your review U.S. Patent No. 6,109,553 which we believe you will find of interest. Should you wish to discuss this matter, please call Kevin Hruska . . . ."[1] After this letter, the parties had no contact for over a year. During the fall of 2004, the parties had a few discussions over the telephone in which they discussed the patents at issue and possible infringement by Duratech.

The next contact between the parties happened at a farm machinery show in Louisville, Kentucky, during February, 2005. During the farm show, Jay Grotrian, vice-president of Duratech, asked Hruska to meet at the Duratech booth to further discuss the patent issue. A representative of Highline Manufacturing, Chuck Lepage, also attended the meeting.[2] The parties agreed to meet on June 8, 2005 to discuss a possible licensing agreement.

―――――――――――――

[1]Kevin Hruska is the president of Bridgeview.

[2]Highline Manufacturing is a licensee of the patents in question.

At the June 8th meeting, Bridgeview proposed a one-time payment of 3.5 million dollars to license the patents. Mr. Grotrian stated that the offer was too much but that he would inform the owners of Duratech of the figure. The meeting concluded with no license agreement.

After the June 8, 2005 meeting, contact between the parties was limited to one letter and two telephone calls. The calls happened on August 4, 2005 and August 18, 2005. On August 19, 2005, Duratech filed this lawsuit, seeking a declaratory judgment of noninfringement. In September, 2005, the defendant filed a lawsuit in Canada, asserting that Duratech is infringing on two Canadian patents, which are similar to the United States patents at issue in this case.  Bridgeview has now moved for dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction. The defendant argues that no actual case or controversy exists because Bridgeview has never threatened litigation over the patents in question.

**III. Discussion**

A.    Standard of Review

The first issue before the Court is the proper standard of review. The plaintiff claims that the Court should treat this Motion as a Motion for Summary Judgment because Bridgeview supported the Motion with affidavits. Although this reasoning would be correct in a motion to dismiss under Rule 12(b)(6) for failure to state a claim, this is a Rule 12(b)(1) motion and

therefore the plaintiff's logic does not apply.

The district court has authority to consider matters outside

of the pleadings when subject matter jurisdiction is challenged

under Rule 12(b)(1). <u>Osborn v. United States</u>, 918 F.2d 724, 728

n.4 (8th Cir. 1990). As the Court explained in <u>Osborn</u>,

> A district court has broader power to decide its own
> right to hear the case than it has when the merits of the
> case are reached. Jurisdictional issues, whether they
> involve questions of law or of fact, are for the court to
> decide. Moreover, because jurisdiction is a threshold
> question, judicial economy demands that the issue be
> decided at the outset rather than deferring it until
> trial, as would occur with denial of a summary judgment
> motion.

918 F.2d at 729.

In addition, because this Motion is a factual attack on

subject matter jurisdiction, no presumptive truthfulness attaches

to the plaintiff's allegations. <u>Id.</u> at 730. The existence of

disputed material facts does not prevent the Court from deciding

the jurisdictional issue. <u>Id.</u> The Court should hold an

evidentiary hearing to resolve the factual disputes, as the Court

has done in this case. The Court must now decide the

jurisdictional issue, not simply rule that there is or is not

enough evidence to have a trial. Accordingly, the Court makes the

following findings of fact and conclusions of law.

     B.    <u>Does the Court have Subject Matter Jurisdiction?</u>

The plaintiff asks this Court for a declaratory judgment

under the Declaratory Judgment Act, 28 U.S.C. § 2201. Before the

Court can entertain a suit for declaratory judgment, there must be a "case or controversy" capable of resolution by the Court. <u>Cardinal Chem. Co. v. Morton Int'l, Inc.</u>, 508 U.S. 83, 96 (1993). There must be an actual and concrete dispute for the Court to adjudicate. The party seeking the declaratory judgment has the burden of establishing the existence of an actual case or controversy. <u>Id.</u> This requirement is both statutory and constitutional. It is part of the general requirement of subject matter jurisdiction and cannot be waived by either party.

In patent litigation, the Federal Circuit has devised a two-part test to determine whether a case or controversy exists. <u>BP Chemicals Ltd. v. Union Carbide Corp.</u>, 3 F.3d 975, 978 (Fed. Cir. 1993).[3] There must be both (1) an explicit threat or other action by the patent holder, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit and (2) present infringement or concrete steps toward infringement. <u>Id.</u> at 978. In the present case, both parties agree that part two of the test is satisfied. Accordingly, the Court will focus on part one of the test.

Whether or not there is a reasonable apprehension of suit focuses on the conduct of the patent holder - Bridgeview. <u>Shell Oil Co. v. Amoco Corp.</u>, 970 F.2d 885, 888 (Fed. Cir. 1992). The

---

[3]The Federal Circuit has exclusive jurisdiction over appeals from United States District Courts in patent litigation. Accordingly, the law of the Federal Circuit applies.

test in an objective one - determined by the totality of the
circumstances. Id. The plaintiff must have an objectively
reasonable basis to believe that the patent holder is going to
sue. A direct threat is not required. Id. Indirect threats or
actions that place the plaintiff in reasonable apprehension of
suit will meet the test. BP Chemicals, 3 F.3d at 989. The
question is this: whether Bridgeview's actions, in light of all
the circumstances, would lead a hypothetical reasonable person in
Duratech's position to fear a lawsuit?

Duratech claims that Bridgeview made numerous explicit and
implicit allegations of infringement and threats of litigation
leading up to the filing of the Complaint in this case.
Bridgeview claims that the parties were engaged in ongoing
license negotiations and that it never explicitly or implicitly
threatened Duratech with a patent suit. Bridgeview argues that
license negotiations between parties are not enough to create a
reasonable apprehension of suit. Therefore, this Court lacks
subject matter jurisdiction over this action.

The Court agrees that license negotiations, standing alone,
are not enough to create a reasonable apprehension of suit.
Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57
F.3d 1051, 1053 (Fed. Cir. 1995). Stating that a product is
"covered" by certain patents during license negotiations is also
not enough, standing alone, to create a reasonable apprehension
of suit. Shell Oil, 970 F.2d at 889. The possibility of a lawsuit

6

always looms over license negotiations. This ability to enforce its patents is the source of defendant's bargaining power.

However, there is a line between cases where the parties merely have adverse interests and cases where there is an actual controversy for the Court to resolve. EMC Corp. v. Norand Corp., 89 F.3d 807, 811 (Fed. Cir. 1996). The present case has crossed that line. This case involves more than ongoing license negotiations or a bare statement that Duratech's product is covered by Bridgeview's patents. The facts show that an actual controversy was present between the parties when Duratech filed suit. Even if Bridgeview did not make any direct threats of litigation, its indirect threats and actions placed Duratech in reasonable apprehension of suit.

The main evidence of Duratech's reasonable apprehension comes from the fact that the parties' license negotiations were broken down by the time Duratech filed suit. The parties license negotiations started in November 2004 with a call from Kevin Hruska to Jay Grotrian, in which the parties discussed the patents in question and possible infringement by Duratech. The discussions continued during two subsequent phone calls in the fall of 2004. In February, 2005, the parties had their first fact-to-face meeting at a farm show in Louisville, Kentucky. During this meeting, Hruska told Duratech that Bridgeview held patents on the right hand disharge used in the BaleBuster and that he felt Duratech was infringing on those patents. Hruska

also told Duratech that Highline Manufacturing was a licensee of the patents and would be involved in license negotiations. The parties agreed to meet again at Bridgeview's place of business in Regina, Saskatchewan.

At the Regina meeting, Duratech again told Hruska that it was not infringing on Bridgeview's patents. Hruska told Duratech that he would like them to stop production of the BaleBuster and pay Bridgeview a royalty on machines already sold. He went on to discuss Duratech's mounting liability if Duratech kept manufacturing the BaleBuster without a license. Hruska also told Duratech that Bridgeview would defend its patents to the best of its ability and that it had already successfully defended the same patents against REM Manufacturing and Highline Manufacturing. Bridgeview then made a 3.5 million dollar license offer to Duratech, which Grotrian rejected.

The parties then had two subsequent phone calls, August 4th and August 18th. During the August 18th call, Duratech made a $100,000 offer to license Bridgeview's patents. Hruska responded that Duratech might have as well offered a dollar, and that Bridgeview's offer still stood at 3.5 million. Lepage then stated that "he could see the road that this was going and that he was fine with that."

It is evident from these discussions that negotiations between the parties had broken down. An objective person in Duratech's position could only conclude that Bridgeview had

8

already decided that Duratech was infringing its patents and that

Bridgeview intended to bring suit unless Duratech gave into its

license demands. At this point in the negotiations, Duratech had

three options: (1) stop manufacturing the BaleBuster, (2) accept

Bridgeview's license offer, or (3) file a suit for declaratory

judgment. Duratech had made it very clear that it would not stop

manufacturing the BaleBuster, and the amount of Bridgeview's

licensing offer - 3.5 million dollars - was sufficiently large to

make the prospect of litigation very realistic. The only logical

conclusion left was that Bridgeview would bring suit to protect

its patents.[4] Accordingly, Duratech was in a position where it

had to protect its interests by filing a declaratory judgment

action. See Phillips Plastics, 57 F.3d at 1053(holding that a

litigation controversy arises when negotiations have broken

down).

The defendant argues that the negotiation meetings were very

casual and that Hruska and Lepage were very conscious of the fact

that they needed not to be threatening. However, the subjective

belief of Hruska and Lepage that they were not threatening does

not matter. As the Federal Circuit explained in EMC Corp.:

> The test for finding a "controversy" for jurisdictional
> purposes is a pragmatic one and cannot turn on whether

---

[4]The reasonableness of this conclusion is strengthened by
the fact that Bridgeview had already successfully defended the
same patents against direct competitors of Duratech. See Shell
Oil, 970 F.2d at 888(stating that related litigation may be
evidence of reasonable apprehension).

> the parties use polite terms in dealing with one another
> or engage in more bellicose saber rattling. The need to
> look to substance rather than form is especially
> important in this area, because in many instances (as in
> this case) the parties are sensitive to the prospect of
> a declaratory judgment action and couch their exchanges
> in terms designed either to create or defeat declaratory
> judgment jurisdiction. In the end, the question is
> whether the relationship between the parties can be
> considered a controversy, and that inquiry does not turn
> on whether the parties have used particular "magic words"
> in communicating with one another.

89 F.3d at 811-12. The need for judicial attention to this case is real and immediate, and the Court will not allow the defendant to avoid resolution of this conflict because it couched its negotiations to avoid declaratory judgment jurisdiction.

## IV.  Conclusion

Duratech had a reasonable apprehension of suit by the time it filed the Complaint in this case. Therefore, there is a sufficient case or controversy to invoke the jurisdiction of this Court under the Declaratory Judgment Act, 28 U.S.C. 2201. The defendant's Motion to Dismiss (doc. #11) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 21st day of April, 2006.

RODNEY S. WEBB  District Judge
United States District Court